IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GLENDA M. REED,                   )
                                  )
          Plaintiff,              )
                                  )
     vs.                          ) Civil Action No. 06-294 Erie
                                  )
COMMISSIONER OF SOCIAL            )
SECURITY,                         )
                                  )
          Defendant.              )

**MEMORANDUM OPINION**

**I. Introduction**

Plaintiff, Glenda M. Reed, seeks judicial review of a
decision of Defendant, Commissioner of Social Security
("Commissioner"), denying her applications for disability
insurance benefits ("DIB") and supplemental security income
("SSI") under Titles II and XVI, respectively, of the Social
Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f. Presently
before the Court are the parties' cross-motions for summary
judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth
below, Plaintiff's motion for summary judgment seeking a remand
of this case for further proceedings will be granted, and the
Commissioner's cross-motion for summary judgment will be denied.

1

## II. Background

### A. Procedural History

Plaintiff filed applications for DIB and SSI on July 10,
2003, alleging disability since June 13, 2003 due to a heart
attack. (R. 62-65, 73, 554-56). Following the denial of her
applications, Plaintiff requested a hearing before an
Administrative Law Judge ("ALJ"). (R. 38-39). At the hearing,
which was held on April 6, 2006, Plaintiff, who was represented
by counsel, and a vocational expert ("VE") testified. (R. 566-
90). On May 10, 2006, the ALJ issued a decision denying
Plaintiff's applications for DIB and SSI, concluding that
Plaintiff retained the residual functional capacity ("RFC") to
perform work existing in significant numbers in the national
economy at the light exertional level.[1] (R. 18-25). Plaintiff
requested review of the ALJ's decision; however, the request was
denied by the Appeals Council on October 10, 2006. (R. 8-11).
As a result, the ALJ's decision became the final decision of the

---

[1]The Social Security Regulations define RFC as the *most* a
claimant can still do despite his or her limitations. *See* 20
C.F.R. §§ 404.1545 and 416.945. Light work involves "lifting no
more than 20 pounds at a time with frequent lifting or carrying
of objects weighing up to 10 pounds. Even though the weight
lifted may be very little, a job is in this category when it
requires a good deal of walking or standing, or when it involves
sitting most of the time with some pushing and pulling of arm and
leg controls. To be considered capable of performing a full or
wide range of light work, [a claimant] must have the ability to
do substantially all of these activities." *See* 20 C.F.R.
§§ 404.1567(b) and 416.967(b).

2

Commissioner. This appeal followed.

## B. Personal History

Plaintiff was born on September 17, 1961. She was 44 years old at the time of the hearing before the ALJ. Plaintiff did not graduate from high school; however, she did obtain a General Equivalency Degree. Plaintiff, who has two adult children, resides with her son, his wife and their two children. In the past, Plaintiff has worked as a bartender, a line worker for a cigarette lighter manufacturer and a staff worker at an animal shelter. (R. 62, 74, 577-78, 583).

At the time she filed her applications for DIB and SSI, Plaintiff identified her disabling condition as a heart attack.[2] (R. 73). However, at the hearing before the ALJ, Plaintiff's counsel stated: "... She's had a heart attack. She's taking a number of heart medications. She's had four stents. But her real problem, and I believe the reason she can't work deals with her psychological problems, with her depressive disorder." Similarly, Plaintiff testified at the hearing that she is unable to work because she is "afraid of people."[3] (R. 570-71).

_____

[2]With respect to the manner in which her heart condition limited her ability to work, Plaintiff stated: "I AM EXTREMELY TIRED, I HAVE CHEST PAINS AND I AM UNABLE TO DO ANYTHING OTHER THAN TAKE CARE OF MYSELF. IF I AM UNDER STRESS OR WORRIED IT GETS WORSE." (R. 73).

[3]At the time she filed her applications for DIB and SSI, Plaintiff reported that she was seeing a therapist for depression, and that the therapist was going to refer her to a

3

Plaintiff attends individual therapy sessions on a weekly or bi-weekly basis, and she sees a psychiatrist for medication management every two months. At the time of the hearing, Plaintiff was taking Paxil, Vistaril and Seroquel for her mental impairments.[4] (R. 576). In 2004, Plaintiff was treated for alcohol dependence. However, she had not had a drink for two years at the time of the hearing. (R. 580-82).

With respect to daily activities, Plaintiff testified that she does no household chores because she resides with her son and daughter-in-law; that she watches television or reads; and that she leaves the house "[a]s little as possible," *i.e.*, only for doctor appointments or counseling sessions. (R. 584, 586).

## C. Vocational Expert Testimony

At the hearing on Plaintiff's applications for DIB and SSI, the ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education and work experience who is capable of performing light work that does not involve more than simple instructions; that does not involve dealing with the public; and that does not require more than occasional contact with

psychiatrist for medication to treat the depression. (R. 94).

[4]Paxil is used to treat depression, panic disorder and social anxiety disorder. Vistaril is used for anxiety and to treat the symptoms of alcohol withdrawal. Seroquel is used to treat the symptoms of schizophrenia. It is also used to treat episodes of mania or depression in patients with bipolar disorder. www.nlm.nih.gov/medlineplus/druginfo (last visited April 7, 2008).

4

supervisors and co-workers. The ALJ then asked the VE whether there were any jobs that the hypothetical individual could perform. The VE responded affirmatively, identifying the jobs line packer and inspector-packer. (R. 588).

## D. Evidence in the Record

### Medical

On June 14, 2003, Plaintiff presented to the Emergency Room of Bradford Regional Medical Center complaining of chest pain. The clinical impression was myocardial infarction.[5] (R. 160-74). Plaintiff was transferred to St. Vincent Health Center where she underwent cardiac catheterization and primary coronary angioplasty and stenting. Plaintiff was discharged from the hospital on June 17, 2003 with diagnoses of (1) Inferior wall myocardial infarction, (2) Single vessel disease with coronary angioplasty and stenting of a dominant circumflex, (3) Tobacco abuse, (4) Dyslipidemia and (5) History of reflux esophagitis.[6] Plaintiff's discharge medications included Aspirin (daily),

---

[5]A myocardial infarction, or heart attack, occurs when low blood flow causes the heart to starve for oxygen. Heart muscle dies or becomes permanently damaged. www.nlm.nih.gov/ medlineplus/encyclopedia (last visited 4/7/2008)

[6]Dyslipidemia is the medical term for high blood cholesterol and triglycerides. This disorder occurs when you have too many fatty substances in your blood and increases your risk for heart disease. Reflux esophagitis is a condition in which food or liquid travels backwards from the stomach to the esophagus (the tube from the mouth to the stomach). This action can irritate the esophagus, causing heartburn and other symptoms. www.nlm. nih.gov/medlineplus/encyclopedia (last visited 4/7/2008).

5

Lopressor, Plavix, Pravachol, Imdur and Nitroglycerin as needed for chest pain.[7]   (R. 175-217).

On August 14, 2003, Plaintiff was admitted to Bradford Regional Medical Center for complaints of chest and abdominal pain, nausea and vomiting. Dr. V. Rao Nadella, Plaintiff's primary care physician, performed a physical examination of Plaintiff and described his impression as follows: 1. Chest pain, ? etiology, 2. Rule out myocardial infarction, 3. Abdominal pain, 4. Possible pancreatitis, 5. Acute gastritis and 6. Status post myocardial infarction with angioplasty and stent placement.[8] Plaintiff was placed on cardiac monitoring and tests were performed. She was treated and discharged from the hospital on August 16, 2003.   (R. 251-78).

Plaintiff's echocardiogram on August 27, 2003 was described as abnormal, *i.e.*, a mildly dilated left atrium and mild mitral

---

[7]Nonprescription aspirin is used to prevent heart attacks in people who have had a heart attack in the past or who have chest pain (angina); Lopressor is used alone or in combination with other medications to treat high blood pressure; Plavix is used to prevent strokes and heart attacks in patients at risk for these problems; Pravachol is used together with lifestyle changes (diet, weight loss and exercise) to reduce the amount of cholesterol and other fatty substances in the blood; Imdur is used to prevent or treat chest pain; and Nitroglycerin is used to treat chest pain.   www.nlm.nih.gov/ medlineplus/druginfo (last visited 4/7/2008).

[8]Pancreatitis is an inflammation or infection of the pancreas, and acute gastritis is a sudden inflammation of the lining of the stomach.   www.nlm.nih.gov/medlineplus/encyclopedia (last visited 4/7/2008).

6

regurgitation.[9]  (R. 279-81).

On October 4, 2003, Dr. Nadella examined Plaintiff at the request of the Pennsylvania Bureau of Disability Determination for purposes of her applications for DIB and SSI.  Plaintiff reported that, despite the angioplasty and stent placement, she continued to experience chest pain and difficulty breathing with any level of exertion.  Dr. Nadella's physical examination of Plaintiff was essentially normal, and his impressions were (1) Coronary artery disease, (2) Unstable angina pectoris, (3) Recent past history of full acute inferior wall myocardial infarction, (4) History of angioplasty and stent placement and (5) History of depression.  (R. 300-03).

On October 24, 2003, Plaintiff was treated by Dr. Mark R. Izze, a cardiologist, for a complaint of shortness of breath with exertion.  Dr. Izze recommended a repeat thallium stress test to rule out any significant restenosis in the distribution of the circumflex.  If the test was negative, Dr. Izze recommended further evaluation of Plaintiff's pulmonary status to explain the shortness of breath with exertion.  Dr. Izze strongly encouraged Plaintiff to quit smoking.[10]  (R. 398).

_____

[9]An echocardiogram is a test that uses sound waves to create a moving picture of the heart.  The picture is much more detailed than an x-ray image and involves no radiation exposure.  www.nlm. nih.gov/medlineplus/encyclopedia (last visited 4/7/2008)

[10]Exhibit 14F in the administrative file, which is described as medical records from Dr. Izze, includes a request from the

7

On November 6, 2003, Dr. Sharon A. Wander, a non-examining State agency medical consultant, completed a Physical RFC Assessment for Plaintiff based on the diagnoses of coronary artery disease, a history of myocardial infarction and unstable angina. With respect to exertional limitations, Dr. Wander opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; that Plaintiff could stand and/or walk at least 2 hours out of an 8-hour workday; that Plaintiff could sit about 6 hours in an 8-hour workday; and that Plaintiff's ability to push and pull in her upper and lower extremities was unlimited. As to postural limitations, Dr. Wander opined that Plaintiff could occasionally balance, stoop, kneel, crouch and crawl, but never climb ladders or scaffolding. Regarding environmental limitations, Dr. Wander opined that Plaintiff should avoid exposure to temperature extremes, fumes, odors, dusts, gases, poor ventilation and heights. Finally, Dr. Wander opined that Plaintiff had no manipulative, visual or communicative limitations.[11]   (R. 304-11).

---

Social Security Administration for a medical report and a Medical Source Statement of Plaintiff's ability to perform work-related physical activities. However, both the medical report and the Medical Source Statement in Exhibit 14F are blank. (R. 387-94).

[11]In support of her Physical RFC Assessment, Dr. Wander noted a Daily Activities Questionnaire completed on July 29, 2003 in which Plaintiff indicated that she was living alone at that time; mowed a medium size lawn; swept 2 floors; could carry 2 grocery bags at a time, clean the house and do the laundry; could climb approximately 28 steps without resting; and could lift 10 pounds.

8

On December 30, 2003, Plaintiff was seen by Dr. Nadella for complaints of intermittent chest pain radiating into both jaws, her back and left upper extremity of 2-3 days' duration and shortness of breath with any exertion. Plaintiff reported that Nitroglycerin provided only partial relief from the pain. In light of Plaintiff's history, she was admitted to Bradford Regional Medical Center and subsequently transferred to Saint Vincent Health Center.[12] Cardiac catheterization revealed significant stenosis in three vessels. Stents were placed in those vessels, and Plaintiff was discharged from the hospital on January 6, 2004 in stable condition. (R. 374-79).

Plaintiff's echocardiogram on July 1, 2004 was described as abnormal, although there had been no significant change since her prior study. (R. 362-63). Plaintiff's stress test on June 10, 2005 was interpreted as follows: "EKG portion of stress test is

---

(R. 84-87). However, it should be noted that Plaintiff also indicated in the questionnaire that she could only perform these activities with frequent breaks due to fatigue.

[12]With respect to past medical history, Dr. Nadella noted that Plaintiff had a history of an inferior wall myocardial infarction with catheterization and stent placement, an appendectomy, gall bladder removal, depression, pancreatitis induced by alcohol abuse and high cholesterol. (R. 379). At the time of this hospitalization, Plaintiff's medications included Lexapro which is used to treat depression and generalized anxiety disorder. www.nlm.nih.gov/medlineplus/druginfo (last visited 4/7/2008)

9

positive for inferior-lateral ischemia."[13] (R. 357). Plaintiff's echocardiogram on July 21, 2005 was described as abnormal, although there had been no significant change since her prior study. (R. 484-85).

## Psychiatric

On July 31, 2003, Plaintiff was evaluated for depression by Dr. Firoz Rahman, a psychiatrist, based a referral by her therapist, Denise Seagren-Peterson. Plaintiff denied any inpatient psychiatric treatment, but reported that she had been seen by Dr. Bazzoui for depression several times. Dr. Bazzoui had prescribed an anti-depressant medication, but Plaintiff admitted that she had not been compliant with the medication. Plaintiff complained of extreme sleep disturbance, *i.e.*, only 2 to 3 hours per night,[14] and she described her appetite and energy levels as "low." Although Plaintiff denied active suicidal or homicidal ideations or auditory or visual hallucinations, she admitted to paranoia, *i.e.*, people were watching her and talking

---

[13]Ischemia means that the heart is not getting enough blood and oxygen. The condition results when the arteries that bring blood and oxygen to the heart are blocked. There may be a build-up of cholesterol and other substances, called plaque, in the arteries that bring oxygen to heart muscle tissue. www.nlm.nih. gov/medlineplus/encyclopedia (last visited 4/7/2008).

[14]Plaintiff reported that her sleep was disturbed by nightmares of abuse in the past. As to the nature of the abuse, Plaintiff reported that she had been sexually abused by her biological parents from ages 12 to 18 and emotionally and physically abused by her common law husband of 20 years. (R. 335-36).

10

about her. Plaintiff admitted to a long history of alcohol abuse, but refused to acknowledge that she had a problem with alcohol.[15] Plaintiff denied any current use of illicit substances, but admitted to cocaine and marijuana use in the past. As to Plaintiff's mental status examination, Dr. Rahman noted that Plaintiff appeared anxious and depressed; her eye contact was sporadic; she was guarded initially but became more open during the interview; the volume of her speech was low; her thought process was logical; she had no loosening of associations or flight of ideas; she denied suicidal or homicidal ideations or auditory or visual hallucinations; her paranoia was "questionable;" she was alert and oriented x 3; her attention span was within normal limits; her immediate memory was intact, although she had some problem with long term memory; and her insight and judgment appeared to be adequate. Dr. Rahman's psychiatric diagnoses included (1) Major depressive disorder, recurrent, severe, (2) Posttraumatic stress syndrome, (3) Victim of sexual abuse as a child, (4) Victim of physical abuse as an adult and (5) Alcohol dependence, and the doctor assessed her score on the Global Assessment of Functioning ("GAF") scale to be

---

[15]With respect to alcohol use, Plaintiff reported that she had last used alcohol the previous evening, when she had 4 or 5 rum and cokes. (R. 336).

11

55.[16]  Plaintiff was encouraged to continue individual
psychotherapy and to abstain from alcohol, and she was given
prescriptions for Lexapro and Seroquel.  (R. 335-37).

On September 11, 2003, Plaintiff was seen by Dr. Rahman for
medication management.  Plaintiff appeared depressed, and she was
reluctant to talk about her problems.  Plaintiff continued to
complain of sleep disturbance due to multiple stressors in her
life, as well as decreased appetite and energy.  Plaintiff
reported that she had been less depressed while taking Lexapro;
however, the prescription had run out about 1½ weeks before this
appointment and her insurance company would not pay for any
further refills.  Samples of Lexapro were given to Plaintiff, and
the medication prescribed to help her sleep was changed from
Seroquel to Sonata.[17]  (R. 334).

On September 15, 2003, John Chiampi, Ph.D., a non-examining
State agency psychological consultant, completed a Psychiatric

[16]The GAF scale considers psychological, social and
occupational functioning on a hypothetical continuum of mental
health to mental illness.  The highest possible score is 100, and
the lowest is 1.  A GAF score between 51 and 60 denotes
"**[m]oderate symptoms** (e.g., flat affect and circumstantial
speech, occasional panic attacks) **OR moderate difficulty in
social, occupational or school functioning** (e.g., few friends,
conflicts with peers or co-workers).  American Psychiatric
Association, Diagnostic and Statistical Manual of Mental
Disorders, Fourth Edition ("DSM-IV"), at 32-34 (bold face in
original).

[17]Sonata is used for short-term treatment of insomnia to help
you fall asleep.  www.nlm.nih.gov/medlineplus/druginfo (last
visited 4/7/2008).

12

Review Technique form for purposes of Plaintiff's applications
for DIB and SSI. Dr. Chiampi analyzed Plaintiff's mental
impairments under Listing 12.04 relating to Affective Disorders
and Listing 12.09 relating to Substance Addiction Disorders. The
required level of severity for these disorders is met when the
requirements in both A and B of the listings are satisfied, or
when the requirements in C are satisfied. Dr. Chiampi concluded
that Plaintiff met the A requirements for these disorders, but
that she did not meet either the B or C requirements. In
evaluating the B criteria of the listings, which pertain to
functional limitations, Dr. Chiampi concluded that Plaintiff was
mildly limited with respect to activities of daily living; that
she was moderately limited with respect to social functioning and
concentration, persistence or pace; and that she had experienced
only one or two episodes of decompensation of extended duration.[18]
(R. 282-95). Dr. Chiampi also completed a Mental RFC Assessment
for Plaintiff based on his review of her file. With respect to
various abilities relating to Understanding and Memory, Sustained
Concentration and Persistence, Social Interaction and Adaptation,
Dr. Chiampi opined that Plaintiff was not significantly limited

---

[18]To meet the B requirements of Listing 12.04 and Listing
12.09, a claimant's mental impairment must result in at least two
of the following: (a) marked restrictions of activities of daily
living; (b) marked difficulties in maintaining social
functioning; (c) marked difficulties in maintaining
concentration, persistence or pace; and (d) repeated episodes of
decompensation, each of extended duration.

13

or only moderately limited. (R. 296-99).

Plaintiff was seen by Dr. Rahman on October 15, 2003 for medication management. Plaintiff reported that her depression had intensified due to problems with her boyfriend; that she was unable to sleep at night; and that her anxiety level was very high. Plaintiff was instructed to increase her dosage of Lexapro, and she was given prescriptions for Sonata and Vistaril. (R. 333).

Plaintiff's next appointment with Dr. Rahman for medication management was November 21, 2003. Plaintiff complained of an inability to sleep at night, high anxiety and difficulty leaving her house. Again, Dr. Rahman described Plaintiff's paranoia, *i.e.*, a belief that people were staring at her, as "questionable." Plaintiff was instructed to continue taking the Lexapro and Vistaril, and she was given a prescription for Ambien.[19] (R. 332).

On January 26, 2004, Plaintiff called Dr. Rahman's office to inform him that the Lexapro was not working. Plaintiff reported feeling more angry with people and wanting to hurt people, men in particular, due to relationship problems. Dr. Rahman was consulted and a prescription for Vistaril was called in to Plaintiff's pharmacy. Plaintiff was instructed to go to the

[19]Ambien is used to treat insomnia (difficulty falling asleep or staying asleep). www.nlm.nih.gov/medlineplus/druginfo (last visited 4/7/2008).

14

Emergency Room or call the hotline if she felt she was going to hurt herself or someone else. (R. 547). Plaintiff did not show for her appointment with Dr. Rahman for medication management on January 30, 2004, and she did not call to cancel. (R. 547).

On June 21, 2004, Plaintiff's therapist, Ms. Seagren-Peterson, performed an interim evaluation of Plaintiff. Plaintiff reported being depressed and anxious, avoiding people and places and staying home a lot. During the evaluation, Plaintiff responded appropriately to questions; did not display any loose associations; denied hallucinations, delusions or obsessive thoughts; denied suicidal or homicidal thoughts; was oriented x 3; appeared to have an average intellect; did not have any memory problems; appeared to have an average attention span; and displayed fair judgment and insight. Plaintiff reported that she had no energy or motivation, and that she was depressed and had trouble sleeping. Ms. Seagren-Peterson assessed Plaintiff's GAF score to be 60, recommending that she continue individual therapy and her prescribed medications. (R. 330-31).

Two days later, on June 23, 2004, Plaintiff saw Dr. Rahman for medication management. Plaintiff appeared slightly depressed and anxious, reporting an episode of "violent blackout." Plaintiff also reported that she had stopped taking her medications in January 2004 because the medications were not working, and Dr. Rahman noted that he had not seen Plaintiff

15

since November 2003. Plaintiff continued to complain of significant problems with sleep, and she admitted to paranoia, *i.e.*, people were talking about her and looking at her, she was very uncomfortable in social situations and she could not go to the grocery store. Dr. Rahman encouraged Plaintiff to continue individual therapy with Ms. Seagren-Peterson, and he prescribed Seroquel for Plaintiff. (R. 329).

Plaintiff was next seen by Dr. Rahman for medication management on August 17, 2004. Plaintiff appeared much calmer than she was during her last appointment, and she reported that she had been compliant with her medication, noticing significant improvement in her anxiety. Plaintiff also reported that although her sleep had improved with the Seroquel, she continued to have difficulty going outside due to panic attacks. Paxil was prescribed for Plaintiff, and she was instructed to continue taking the Seroquel and to make an appointment with her therapist. (R. 328).

On September 16, 2004, Plaintiff presented to the Emergency Department of Bradford Regional Medical Center stating that she was "having a nervous breakdown." Plaintiff was admitted to the hospital's psychiatric unit, and Dr. Roger R. Laroche, a psychiatrist, evaluated her the next day. Dr. Laroche noted Plaintiff's long history of alcohol abuse and behavioral problems which had resulted in her presentation to the Emergency

16

Department the previous day.[20]  Dr. Laroche's impression included

(1) Alcohol dependence, (2) Major depression by history (rule out

alcohol-induced mood syndrome) and (3) Borderline personality

disorder, and he assessed Plaintiff's GAF score at that time to

be 40.[21]  Dr. Laroche's plan for Plaintiff included continuation

of her prescribed medications, inpatient alcohol rehabilitation

and psychotherapy.  Plaintiff was discharged from the hospital on

September 22, 2004 with a GAF score of 55.  (R. 312-24).

On October 25, 2004, following her completion of a 28-day

inpatient alcohol rehabilitation program, Plaintiff was admitted

to the Intensive Outpatient Program for alcohol dependence at

Bradford Recovery Systems.  She did not complete the program,

however, and was prematurely discharged on December 9, 2004.  A

note of Jessica Clark, a psychologist at Bradford Recovery

Systems, indicates that Plaintiff attended only 5 days of group

_____

[20]Dr. Laroche described Plaintiff's character profile based
on the information she provided as follows: "Anger as a prominent
mood; explosive anger episodes, which are out of control and
sometimes include violence and destruction of property; extreme
mood lability; chronic emptiness and loneliness; blaming other
people and situations for her behaviors; history of poor
responsibility as per employment and relationship patterns; and
chronic suicidal ideations."  (R. 314).

[21]A GAF score between 31 and 40 denotes **"[s]ome impairment in
reality testing or communication** (e.g., speech is at times
illogical, obscure, or irrelevant) **OR major impairment in several
areas, such as work or school, family relations, judgment,
thinking, or mood** (e.g., depressed man avoids friends, neglects
family, and is unable to work; child frequently beats up younger
children, is defiant at home, and is failing at school).  DSM-IV,
at 32-34 (bold face in original).

therapy treatment while she was in the Intensive Outpatient
Program, and that Plaintiff's prognosis was poor due to her lack
of compliance with the program. (R. 426-36).

The next record of a medication management appointment with
Dr. Rahman is dated January 12, 2005. Dr. Rahman noted
Plaintiff's psychiatric hospital admission in September 2004; her
referral to Maple Manor for alcohol dependence; her successful
completion of Maple Manor's 28-day inpatient program; her
continued regular attendance at AA meetings; and her abstinence
from alcohol use. With respect to her mental impairments,
Plaintiff reported that she was not feeling as good as she had
been because she had run out of medication about a month before
this appointment and she had not been able to sleep. Plaintiff
described her anxiety level as "high" and her depression as
"okay." Dr. Rahman gave Plaintiff new prescriptions for Paxil,
Seroquel (increase) and Vistaril (increase). (R. 327).

During her next medication management appointment with Dr.
Rahman on March 25, 2005, Plaintiff appeared extremely anxious
and depressed. Plaintiff had been evicted from her home, and she
admitted to sporadic use of alcohol. Plaintiff reported that she
had been compliant with her medications, but that the medications
were not helping her anxiety and depression. Plaintiff was
strongly encouraged to abstain from alcohol and to make an
appointment with her therapist whom she had not seen "for a long

18

time."  Plaintiff was given prescriptions for Paxil (increase),
Seroquel and Vistaril.  (R. 326).

Plaintiff's next medication management appointment with Dr.
Rahman took place on May 27, 2005.  At that time, Plaintiff
appeared slightly anxious, and she reported continued social
anxiety and panic attacks.[22]  Plaintiff indicated that the
Seroquel was helping her sleep problem, although she still
occasionally woke up in the middle of the night due to nightmares
about abuse, and that her depression was partially under control.
Prescriptions for Paxil, Seroquel and Vistaril were given to
Plaintiff, and she was instructed to abstain from alcohol and to
make an appointment with her therapist.  (R. 325).

During her next medication management appointment with Dr.
Rahman on July 22, 2005, Plaintiff reported feeling depressed all
the time, crying for no reason and "scared" to go outside due to
paranoia about people looking at her and talking about her.
Plaintiff described her relationship with her boyfriend as a
"constant struggle," but claimed that she could not leave him
because she was "totally broke."  Plaintiff indicated that she
was compliant with individual therapy, but stated the therapy was
not helping her.  Moreover, due to her paranoia, Plaintiff had a

_____

[22]In fact, Plaintiff reported difficulty sitting in Dr.
Rahman's waiting room because there were a lot of people.  As a
result, she stood outside the door to the room waiting to be
called for her appointment.

19

difficult time going to the therapy sessions. Dr. Rahman counseled Plaintiff, encouraged her to continue individual therapy and gave her prescriptions for Paxil (increase), Seroquel (increase) and Vistaril. (R. 548).

Plaintiff's next medication management appointment took place on September 30, 2005. Plaintiff appeared depressed and teary, complaining of problems with her boyfriend who was verbally, emotionally and physically abusive towards her. Plaintiff reported that she had applied for housing and for Social Security benefits. In the meantime, Plaintiff's son had agreed to let her stay with him, and Plaintiff indicated that she was moving out of the apartment she shared with her boyfriend that day. Plaintiff was encouraged to continue individual therapy and to continue taking her prescribed medications. (R. 549).

Plaintiff's next medication management appointment with Dr. Rahman, which had been scheduled for December 6, 2005, was canceled due to weather and rescheduled for January 23, 2006. During this appointment, Plaintiff appeared anxious, reporting that her situation remained the same. She was still living with her son, still waiting to hear about housing and Social Security benefits, and still experiencing difficulties when she left her residence. Plaintiff was encouraged to continue individual therapy, and she was given new prescriptions for Paxil, Seroquel

and Vistaril. (R. 552).

The final notes of a medication management appointment with Dr. Rahman are dated March 24, 2006, approximately two weeks before the ALJ hearing. Dr. Rahman indicated that Plaintiff appeared slightly guarded and anxious, reporting that she had a court date in connection with her claim for Social Security benefits. Plaintiff was encouraged to continue individual therapy and to take her prescribed medications. (R. 553).

On March 27, 2006, Ms. Seagren-Peterson, Plaintiff's therapist, wrote a brief letter to Plaintiff's counsel in which she stated that she had been counseling Plaintiff since July 2003 for depression, anxiety, past abuse and posttraumatic stress disorder, listing Plaintiff's diagnoses as (1) Major depressive disorder, recurrent, severe, (2) Generalized anxiety disorder, (3) Posttraumatic stress disorder, (4) Victim of sexual abuse as a child, (5) Victim of physical abuse as an adult and (6) Alcohol dependency, in remission. Ms. Seagren-Peterson rendered no opinions concerning the effect of Plaintiff's mental impairments on her ability to engage in work-related activities. (R. 545).

### III. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C. § 405(g) and § 1383(c)(3) (incorporating § 405(g)), which provide that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the

21

district court of the United States for the judicial district in which the individual resides. Based upon the pleadings and the administrative record, the district court has the power to enter a judgment affirming, modifying or reversing the Commissioner's decision with or without a remand for a rehearing.

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## IV.  **Legal Analysis**

### A.  **The ALJ's Decision**

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

22

continuous period of not less than 12 months. 42 U.S.C.

§ 423(d)(1). A Social Security claimant is considered unable to

engage in any substantial gainful activity only if her physical

or mental impairment or impairments are of such severity that she

is not only unable to do her previous work but cannot,

considering her age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the

national economy. 42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220

F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure

an ALJ must follow in evaluating a claim for Social Security

disability benefits, stating in relevant part:

\* \* \*

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity. 20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987). In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment. 20 C.F.R.
§ 404.1520(c). If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work. 20 C.F.R. § 404.1520(d). If a claimant
does not suffer from a listed impairment or its

23

> equivalent, the analysis proceeds to steps four and
> five. Step four requires the ALJ to consider whether
> the claimant retains the residual functional capacity
> to perform her past relevant work. 20 C.F.R.
> § 404.1520(d). The claimant bears the burden of
> demonstrating an inability to return to her past
> relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d
> Cir.1994).
>
> If the claimant is unable to resume her former
> occupation, the evaluation moves to the final step. At
> this stage, the burden of production shifts to the
> Commissioner, who must demonstrate the claimant is
> capable of performing other available work in order to
> deny a claim of disability. 20 C.F.R. § 404.1520(f).
> The ALJ must show there are other jobs existing in
> significant numbers in the national economy which the
> claimant can perform, consistent with her medical
> impairments, age, education, past work experience, and
> residual functional capacity. The ALJ must analyze the
> cumulative effects of all the claimant's impairments in
> determining whether she is capable of performing work
> and is not disabled.
>
> Plummer, 186 F.3d at 428.

\*   \*   \*

220 F.3d at 118-19.

With respect to the ALJ's five-step sequential evaluation in
the present case, step one was resolved in Plaintiff's favor:
that is, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since her alleged onset date of
disability of June 13, 2003. (R. 20). As to step two, the ALJ
found that the medical evidence established the following severe
impairments: an affective disorder, an anxiety disorder and

24

coronary artery disease status post myocardial infarction.[23] (R. 20). Regarding step three, the ALJ found that Plaintiff's impairments did not meet or equal the requirements of any listed impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1. (R. 22-23). Turning to step four, the ALJ found that Plaintiff was unable to perform her past relevant work because the jobs exceeded the light exertional level, required more than simple instructions, required dealing with the public and required more than occasional contact with supervisors and co-workers. (R. 23-24). Finally, at step five, based on the testimony of the VE, the ALJ found that considering Plaintiff's age, education, past work experience and RFC, there were a significant number of jobs at the light exertional level in the national economy which Plaintiff could perform. Thus, Plaintiff was not disabled. (R. 24-25).

## B. Discussion

In her motion for summary judgment, Plaintiff seeks a remand of this case for further proceedings, raising two related

---

[23]Under the Social Security Regulations, an impairment or combination of impairments is severe if it significantly limits a claimant's physical or mental ability to perform basic work activities which include (a) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, (b) capacities for seeing, hearing and speaking, (c) understanding, carrying out and remembering simple instructions, (d) use of judgment, (e) responding appropriately to supervision, co-workers and usual work situations, and (f) dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1520(c), 404.1521(b), 416.920(c) and 416.921(b).

arguments. First, Plaintiff asserts that the ALJ's decision is not supported by substantial evidence. Second, Plaintiff asserts that the ALJ erred by failing to fully develop the record.

In his decision, the ALJ described Plaintiff's RFC as follows: "... the claimant has the residual functional capacity to perform the physical requirements of light work, which is the ability to lift and carry up to 20 pounds occasionally, stand and walk for at least six hours a day, and occasionally perform postural activities. She can understand, remember and carry out simple instructions. She can occasionally deal with co-workers and supervisors but cannot deal with the public." (R. 23).

With respect to the ALJ's physical RFC assessment in this case, Plaintiff asserts that the ALJ's decision "does not provide examining or non-examining medical evidence to support the conclusion that [she] has the physical ability to perform light work." (Pl's Brief, p. 10). The record does, in fact, contain some evidence supporting a physical capacity for light work, *i.e.*, the November 6, 2003 Physical RFC Assessment completed by Dr. Wander, the non-examining State agency medical consultant.[24] However, the Court concludes that Dr. Wander's Physical RFC Assessment does not constitute substantial evidence supporting the ALJ's physical RFC finding because the assessment was based

---

[24]Interestingly, the ALJ does not cite Dr. Wander's Physical RFC Assessment as support for his adverse decision.

on an incomplete record. Specifically, Dr. Wander's Physical RFC
Assessment was completed prior to (1) Plaintiff's hospitalization
in December 2003 for complaints of chest pain which resulted in
the placement of three additional stents, (2) Plaintiff's lengthy
history of treatment by Dr. Nadella for chest pain and shortness
of breath and (3) various heart studies which consistently were
described as abnormal. Accordingly, the Court agrees with
Plaintiff that the ALJ's determination that she retained the
physical RFC for light work is not supported by substantial
evidence.

The Court also agrees with Plaintiff that the ALJ erred by
failing to obtain a medical source statement from Dr. Nadella
regarding her ability to perform physical work-related
activities, despite her heart condition, on a regular and
continuing basis.[25] As noted previously, Dr. Nadella performed a
consultative examination of Plaintiff on October 4, 2003 at the
request of the Pennsylvania Bureau of Disability Determination.
Under the Social Security Regulations, the report of a complete
consultative examination should include, among other things, a
statement describing the opinion of the medical source about the

---

[25]Social Security Rulings ("SSR") are agency rulings
published "under the authority of the Commissioner of Social
Security" and "are binding on all components of the Social
Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d
Cir.2000). According to SSR 96-8p, a "regular and continuing
basis" means 8 hours a day for 5 days a week or an equivalent
work schedule.

27

claimant's ability, in light of his or her impairments, to do work-related activities, such as sitting, standing, walking, lifting and carrying. *See* 20 C.F.R. §§ 404.1519n(c) and 416.919n(c). Despite this regulation, the Social Security Administration failed to obtain such a statement from Dr. Nadella in conjunction with his consultative examination of Plaintiff. Therefore, the consultative examination was incomplete. Moreover, the ALJ relied on the absence of such a statement to support his finding that Plaintiff retained the physical RFC to perform light work,[26] and such reliance is impermissible.[27] *See* Manning v. Secretary of Health and Human Services, 881 F.Supp. 201, 204 (W.D.Pa.1995), *citing*, Diller v. Brown, 654 F.Supp. 628, 630 (W.D.Pa.1987)("It is error for an ALJ to fail to obtain a complete consultative examination and then to deny benefits because the record lacks the evidence such an examination could have produced."). Finally, the Court notes that Dr. Nadella's

---

[26]The ALJ stated: "Dr. V. Rao Nadella examined the claimant at the request of the Administration on October 4, 2003 and the examination results were objectively normal. The claimant did complain of ongoing chest pain and difficulty breathing with exertion. Dr. Nadella offered no opinion with regard to functional limitations." (R. 21).

[27]The record also contains evidence that Drs. Nadella and Izze were asked by the Social Security Administration on July 19, 2005 to submit reports concerning Plaintiff's impairments, including an assessment of Plaintiff's physical RFC. (R. 117, 128). However, for unknown reasons, neither treating source submitted an assessment of Plaintiff's physical RFC, and the Social Security Administration never followed up on their failure to do so.

28

consultative examination of Plaintiff was performed shortly after she filed the applications for DIB and SSI, and the record now includes substantially more evidence concerning Plaintiff's heart condition.  Thus, on remand, the ALJ is directed to obtain a medical source statement regarding Plaintiff's ability to perform physical work-related activities from Dr. Nadella or a consultative examiner.

Turning to Plaintiff's depression and anxiety, the Court concludes that the ALJ's findings with regard to the limited restrictions resulting from Plaintiff's mental impairments, *i.e.*, work involving only simple instructions, no dealing with the public and only occasional dealing with co-workers and supervisors, are not supported by substantial evidence.  The only Mental RFC Assessment in the record is the assessment completed on September 15, 2003 by Dr. Chiampi, the non-examining State agency psychological consultant.  However, like the Physical RFC Assessment completed by Dr. Wander, Dr. Chiampi's Mental RFC Assessment was based on an incomplete record.  Specifically, Dr. Chiampi's assessment was completed shortly after Plaintiff filed her applications for DIB and SSI, and the records of her treatment for depression and anxiety were sparse.  Since that time, Plaintiff has received regular mental health treatment and she has had a psychiatric hospital admission.  Under the circumstances, on remand, the ALJ also is directed to obtain a

29

medical source statement from Dr. Rahman, Plaintiff's long-time treating psychiatrist, or a consultative examiner concerning Plaintiff's ability to engage in work-related mental activities.

Based on the foregoing, Plaintiff's motion for summary judgment seeking a remand of this case for further proceedings will be granted, and the Commissioner's cross-motion for summary judgment will be denied.

*William L. Standish*

William L. Standish
United States District Judge

Date: April **10** , 2008